(Lucas County Court of Common Pleas.)

Samuel A. Hunter, Treas. v. Florence Newman.

Samuel A. Hunter, Treas. v. Nancy M. Emerson.

---

In a contract for a limited partnership, it was agreed among other things that the special partners, as their share of the profits, should receive interest at a specified rate per annum on the sums of money contributed by them as capital, and that the general partners should become responsible to them for the capital so contributed, and interest.

*Held*, that in the absence of fraud or bad faith the contract does not constitute a loan of money to the partnership, and that the sums so contributed are not subject to taxation as "credits" of the special partners.

(Decided July 6, 1892.)

---

Pugsley, J.

These actions are brought by the county treasurer, under section 2859 of the Revised Statutes, to recover certain personal taxes standing upon the duplicate of 1891, the taxes being charged as omitted taxes, under sections 2781 and 2782 of the Revised Statutes. Section 2781 provides: "That if any person whose duty it is to list property for taxation, shall make a false return, or evade making a return, the county auditor shall for each year ascertain as near as practicable the true amount of personal property that such person ought to have returned, not exceeding five years next prior to the year in which the correction is made, and to the amount so ascer-

tained for each year he shall add fifty per cent. as penalty, and enter the same with the proper amount of taxes on the tax list in his office, giving a certificate therefor to the county treasurer, who shall collect the same as other taxes."

Section 2782 requires the auditor to file in his office a statement of the facts or evidence upon which said corrections are made.

The auditor proceeded under these sections, and, upon the 29th of Ocber, after notice to the defendants and taking testimony upon the subject, he found that from January, 1888, to July, 1891, the defendants were the owners of certain credits which should have been returned for taxation in each of the years 1888, 1889, 1890 and 1891, and that the defendants wrongfully evaded making return of these credits; that the credit that was owned by Florence Newman was the sum of $50,000.00, and the credit owned by Nancy M. Emerson was the sum of $25,000.00. The auditor entered upon his tax list of each of those years these sums, with a penalty of fifty per cent. added, and the taxes upon these sums and penalty, making the total taxes charged for these four years, against Florence Newman the sum of $8,400.00, and against Nancy M. Emerson the sum of $4,200.00.

On the same day, October 29, 1891, the auditor gave certificates for these taxes to the county treasurer for collection.

These suits are brought to collect such taxes, and were tried to the court upon the pleadings and the evidence, a jury being waived. There is very little dispute, if there is any, as to the facts. The evidence shows that Florence Newman is the only child, and Nancy M. Emerson is the widow of George Emerson, who died intestate, in the year 1887, and upon whose estate Lawrence Newman, the husband of Florence, was appointed administrator. At the time of his death, Mr. Emerson was a member of the firm of Emerson & Co., whosesale grocers of this city, (Toledo.)

On the 1st of January, 1888, the interest of the estate of said deceased in the business and property of Emerson & Co. amounted to the sum of $75,-000.00, and upon that day, the 1st of January, the administrator filed his account with the probate court, wherein he credited himself with the sum of $50,000.00, paid to Mrs. Newman, and the sum of $25,000.00, paid to Mrs. Emerson. No money, however, was actually paid or received, but the entire sum of $75,000.00 was allowed by the defendants to remain in the business, and, by proper transfer, was placed by them in the name of Lawrence Newman in the business of a limited partnership which was then formed between Mr. Newman and the surviving members of the firm of Emerson & Co.

That partnership was evidenced by a written contract which was entered into upon the 2nd day of January, 1888. The controversy here mainly depends upon a proper construction of that contract. I will read it.

"Articles of co-partnership made and entered into this 2nd day of January, 1888, by and between Pliny Watson, Zebulon Pheatt, Andrew J. Snell, Edward E. Dow and Lawrence Newman, *Witnesseth*:

"That a limited co-partnership for the purpose of carrying on the wholesale grocery and commission business in the city of Toledo, is hereby entered into under the name and style of Pliny Watson & Co., in which all the above named parties shall be general partners except Lawrence Newman, who shall be a special partner, and the capital stock is contributed in the following proportion and amounts: Pliny Watson, $80,000.00; Edward E. Dow, $10,000.00; Andrew J. Snell, $10,000.00; Lawrence Newman, $75,000.00: Zebulon C. Pheatt, only his services. Said co-partnership shall continue for the period of three years, and may be dissolved sooner by thirty days written notice to the other partners, which notice must be signed by at least two of the partners.

" It is hereby agreed by the parties to this agreement, who are the general partners, that their time shall be given to the business; that neither partner shall use the name of the firm or his own name to indorse or accept any paper for the accommodation of any person or for the firm, or become surety, except by the consent of all the partners.

"That the net profits of the business after paying interest on capital and expenses and losses, shall be divided as follows : To Pliny Watson, fifty-six (56) per cent.; to A. J. Snell, twelve (12) per cent.; to Z. C. Pheatt, six-teen (16) per cent.; to E. E. Dow, sixteen (16) per cent., and the losses to be borne in the same proportion. That on the capital stock contributed there shall be allowed those contributing seven per cent. interest per annum, except Lawrence Newman, who shall receive eight (8) per cent. per annum as his interest and share of the profits.

"It is hereby agreed by *all* the parties to this agreement that the partners shall not draw out of said business for private use over the following sums per annum : Pliny Watson. $8,000.00 ; Z. C. Pheatt, $2,000.00 ; E. E. Dow, $1,500.00.; A. J. Snell, $1,500.00 ; Lawrence Newman, $6,000.00, being his interest.

"Upon dissolution or final settlement, the following course shall be adopted.

"*First.*—The liabilities of the firm shall be paid. *Second.*—The capital stock contributed by the special partner, with any unpaid interest, shall be paid to him. *Third.*—The capital stock contributed by the other partners, with any unpaid interest thereon, shall be paid them in proportion as contributed, and the surplus shall be divided among the general partners upon the basis that the profits are to be divided; and that the said Lawrence Newman shall have on the capital contributed by him interest at the rate of eight per cent. per annum, payable semi-annually, which, with the principal, the said general partners become responsible to him for; and as between said Lawrence Newman and the other partners he shall have 8 per cent. interest free from expenses and taxes, except that the firm of Pliny Watson & Co., and the general partners, shall not be liable for any tax returned or assessed on said Lawrence Newman's interest of $75,000.00, as aforesaid, further than as taxes may be returned by or assessed against the said firm on their capital and business as a whole.

"Witness the signatures of said parties this 2nd day of January, 1888.
" PLINY WATSON,
" Z. C. PHEATT,
" EDWARD E. DOW,
" ANDREW J. SNELL.
" LAWRENCE NEWMAN."

This contract was signed by all the parties. The business was carried on under this contract, during the term of three years. On January 2, 1891, when the contract expired, it was renewed in substantially the same form, for another period of three years, and between the same parties. On January 5, 1891, Pliny Watson died, and on January 6, 1891, a new agreement was entered into in substantially the same form, for the period of one year, and between the same parties, excepting that the widow and heirs of Pliny Watson, took his place in the firm. The business was carried on under these new agreements until July, 1891, when the partnership was dissolved, and there was paid to Lawrence Newman, for the defendants, the sum of $75,000 00, and whatever interest was then unpaid.

These several agreements were recorded and published, as required by the law of the state. The question to be determined from these facts is : whether, during the years mentioned, the defendants were the owners of credits within the meaning of the tax laws—in other words, whether the investment by the defendants, of their money in this so-called limited

partnership, was, in effect, a loan by them to the firm of Pliny Watson & Co., or to the general partners?

It is claimed by counsel for plaintiff, first, that the defendants were not parties to this partnership agreement; that Lawrence Newman·was the partner, and that having received this money—$75,000.00—from the defendants, he owed it to them, and it is claimed, therefore, that, as against the defendants, this money was a taxable credit.

This claim is not borne out by the proof. The $75,000.00 which was put into the business, was the money of the defendants, and it was so understood by all of the parties. Mr. Watson was unwilling that the names of women should appear in the business, and, solely for that reason, Mr. Newman allowed his name to be used as the representative of the defendants. He was to receive no benefit, and he actually received no benefit from the investment; whatever interest was paid was received by the defendants. Mr. Newman, at no time during the existence of the partnership, owed the defendants anything, and at no time did they have any claim against him. Whatever may be said as to the relations which Mr. Newman sustained to the creditors of the firm, by reason of his name being used, he was in no sense responsible to the defendants for their money, or for their profits or losses in the business. The contract was entered into by him for them, and in their behalf, and in determining the relations of the·parties, as between themselves, the contract must be construed as if *they*, and not he, had signed it.

The question, then, is: what was the real transaction between these parties, as evidenced by this contract and the whole contract? In construing it, it must be read and construed in the light of the situation and the acts of the parties, and in the light of the limited partnership statute under which the contract was made—which must be treated as a part of the contract. If the real transaction was a loan of money to the firm, of course it cannot be disguised or changed by any form which the transaction was made to assume. But bad faith will not be presumed. If parties declare their intention to enter into a partnership, and the terms and provisions of the contract are consistent with the partnership relation, they must be held to be partners. If, on the other hand, the contract is inconsistent with the partnership relation, they are not partners, though they call themselves partners. The contract must be held to be what it purports to be—unless its provisions necessarily lead to the conclusion that it is in reality something different; and if the contract is equally susceptible of two different constructions, and it is valid under either, that construction will be given which is in accord with the declared intention of the parties—where there is no evidence of fraud or bad faith. I find no evidence in this case that this contract was entered into for any fraudulent purpose. The use of the name of Lawrence Newman in the business, instead of the names of the defendants, is satisfactorily explained. The records—which were open to public inspection—show, that upon the first day of January, 1888, the defendants received $75,000.00 from the estate of George Emerson, and that upon the 2nd day of January, 1888, Lawrence Newman—the husband of one of the defendants—put the same sum of money into the limited partnership. That is what appears upon the face of the record; and from that, in the absence of proof, it might reasonably be inferred that Lawrence Newman had borrowed the money from the defendants; it would be evidence upon its face pointing to the fact that the defendants were possessed of credits which were subject to taxation. I mention this to show that it is not probable that any fraudulent concealment was intended by using the name of Lawrence Newman in the business, as is charged, but that the reason which was assigned for doing that, was the true reason, I apprehend also, that if the defendants invested their money

in the business of a limited partnership, instead of loaning it, because they might thereby avoid the payment of taxes upon the money, (of which, however, there is no proof), that would not be evidence of fraud, and would not of itself, convert a partnership contract into a contract for a loan. They had a right to invest their money in any way they saw fit, provided it was not illegal, and the motives are immaterial. The real question is: what have they done? Have they formed a partnership, or have they simply made a loan? An examination of this contract, in connection with the statute, discloses several features which are inconsistent with the idea of a loan, and are consistent only with a partnership relation. I will allude to a few of them.

In the first place, the entire sum contributed by the special partner, was subject to the debts of the firm, and was put in at the risk of the business. It could all be taken, if necessary. In case of a dissolution, both by the terms of the statute, and by express agreement, the special partner could not claim a return of any part of his capital, until all the debts were paid, and, in the case of insolvency, he would get nothing out of the firm assets. Second, as special partner, Newman was jointly interested with the other partners in the profits of the business. The language of the contract is, "Lawrence Newman shall receive eight per cent. per annum, as his interest and share of the profits." It is claimed that this provision is absolute, and that the special partner is entitled to interest on his money without regard to the success of the business, or whether or not there were profits. The contract does not say so, and, reading it so as to be in harmony with the statute, such a construction is, in my judgment, inadmissible.

Section 3151, of the Revised Statutes, reads as follows:

"No part of the sum contributed to the capital stock by a special partner, shall be withdrawn by him, or paid or transferred to him, in the shape of dividends, profits, or otherwise, at any time during the continuance of the partnership; but such partner may annually receive lawful interest on the sum contributed by him, if the payment of such interest will not reduce the original amount of the capital, and if, after the payment of such interest, any further profits remain to be divided, he may also receive his portion of such profits."

The payment of interest on the capital stock was, therefore, lawful; but, as no part of the capital stock can be withdrawn, the payment of interest could only be made if the profits should warrant it.

Third. The provisions of the statute are such that a special partner must be regarded as having an interest in the property and assets of the firm, and in the proper management of the business. By section 3154, a special partner may call the general partners to an account, both in law and equity, for the management of the partnership affairs and business, and he may file a bill to dissolve the partnership, for the same causes for which other partnerships may be dissolved. In all these respects the contract is inconsistent with the theory of a loan of money.

In this connection, I refer to Vol. 1, Lindley on Partnership, page 23, where the author says:

"Whether a person advancing money and sharing profits is a creditor or a dormant partner, is often a very difficult matter to determine, and can only be decided by a careful study of the whole agreement between the borrower and the lender, and especially by examining what rights are conferred on, or taken from the person making the advance. The right of a lender is to be repaid his money with such interest or share of profits as he may have stipulated for; and his right to a share of profits, involves a right to an account, and to see the books of the borrower. If he stipulates for more than this, (e. g. for a right to control the business, or the employ-

ment of the assets, or to wind up the business), or if his advance is risked in the business, or forms part of his capital in it, he ceases to be a mere lender, and becomes, in effect, a dormant partner."

To justify the claim that this contract was for the loan of money, and not a partnership, the plaintiff relies chiefly upon that provision of the contract which reads as follows: "And that the said Lawrence Newman shall have on the capital contributed by him interest at the rate of eight per cent. per annum, payable semi-annually, which, with the principal, the said general partners become responsible to him for."

I apprehend that if this clause was not in the contract, there would be no serious claim that it amounted to a loan. It is said that by reason of this provision of the contract, Newman was to get back his money and interest, without regard to the success of the business or the making of profits, and that this constitutes a loan of money pure and simple. This argument ignores the statute and ignores all the other provisions of the contract. The same argument could be made against the existence of any partnership where one partner is guaranteed against loss by the other partners; but, it is well settled that there may be a valid partnership, notwithstanding such guaranty. The stipulation against loss does not prevent the contract from being one of partnership, if it otherwise would be one of partnership. This is clearly shown by the authorities which were cited upon the argument. Among the cases cited was *Clift* v. *Barrow*, 108 N. Y. 187. In that case it was agreed between A. and B. that A. might use the name of B. in the firm of A. & Co. B. was not to share in the profits or losses of the business, except that he was "to have for his share of the profits" ten per cent. per annum on all money contributed by him. A. agreed to keep B. harmless from all losses and debts, and, upon dissolution, A. was to return to B. all his capital with ten per cent. interest. It was held, that the agreement, when acted upon, formed a valid partnership; that the agreement to pay the percentage was not absolute, but conditional upon there being profits to that amount from which the payment could be made; that B. was liable for the losses and debts, and that A's covenants against losses and debts was not one to prevent such liability, but was merely one of indemnity.

The principle of that decision, it seems to me, is applicable here; and we have the further consideration—that the statute fixes the status of a special partner, as a partner, and not as a creditor. Construing this statute and all the provisions of the contract together, it appears that the capital contributed by Newman at once became liable for the debts of the firm; that the agreement of the general partners to indemnify him against loss, did not prevent that liability; that he was not entitled to receive from the firm interest upon his capital, except out of the profits of the business, and that upon dissolution of the firm he could claim no part of his capital until all the firm debts were paid. If the profits or firm assets were not sufficient to reimburse him, then the general partners became individually responsible to him for the deficiency. It was a contract merely of indemnity, and cannot convert the partnership into a mere loan. I find, from the whole contract and all the evidence that a partnership relation existed between these parties, and, this being found, there is no principle upon which the agreement of indemnity can be separated from the contract and be made taxable. It is in no sense a credit. A partner cannot be individually taxed upon his contribution to the capital of the firm, either directly or indirectly.

It is alleged in the answer of Florence Newman: "That during all the time aforesaid, the said sum of $50,000 remained in said firm as part of its capital, and during all of said term, the said firm of Pliny Watson & Company, and its successor firm, returned the assets, property and

capital of the said firm for taxation, and paid all the taxes due and chargeable against said firm, during each and all of the years aforesaid.

The same allegations are made in the answer of Mrs. Emerson, as to her sum of $25,000. These allegations of the answers are denied by the replies, and no evidence was offered upon the subject. It is now claimed by plaintiff that the defendants cannot escape taxation of those sums as credits— unless it is shown (and the burden is upon them to show it), that these sums were taxed as part of the property of the firm.

There are, I think, several answers to that claim. In the first place, if it is conceded that the duplicate is *prima facie* evidence of the amount and validity of the taxes, and that the burden is upon the defendants to .show that the taxes are illegally charged, proof that these sums are not credits, within the meaning of the tax laws, is proof that the defendants are not required to return them for taxation, and that the taxes upon these sums can not lawfully be charged against the defendants individually. There is no claim in this case that the defendants are required to pay taxes upon these sums otherwise than as credits. If they are not credits, and the defendants are not required to return them for taxation, it is wholly immaterial whether or not the firm has been required to make a proper return of its property for taxation, or whether it has paid the taxes charged against it, and in the case of a limited partnership it is the duty of the general partners to make the proper return. Special partners have no right, and are under no obligation to make it.

In the next place, the contributions made to a partnership by its members are not taxable, as such, against the firm. The firm is required to list for taxation its personal property and credits in the same manner as individuals. The property of a mercantile partnership is the average value of its goods and merchandize in its possession or under its control during the previous year. Its credits are the excess of demands due to it over and above its *bona fide* debts. A proper return made by the firm would not show the capital contributed by any partner, whether general or special. It might be presumed only that the greater the amount of capital invested, the greater the amount of property it would have for taxation.

If it were shown that the general partners, in returning the firm property for taxation, treated the $75,000 as a debt, and deducted it from sums due to them, in order to ascertain their taxable credits, that might be evidence that the firm regarded the $75,000 as a loan, and if that were known to the special partner, it might be of some importance in construing this contract; but there is no proof here on the subject, and there can be no presumption.

Some questions were discussed relating to the authority of the treasurer to place these amounts upon the duplicate under the circumstances, and as to the regularity of the proceedings under which these sums were charged against the defendants; but, as I find from the evidence that these sums were not taxable credits against the defendants, it is unnecessary to consider these other questions, and the judgment in each case will be for the defendant.

*J. A. Barber*, Pros. Atty., *C. E. Sumner*, Asst. Pros. Atty., *N. E. Warwick*, for plaintiff.

*C. W. Everett, Doyle, Scott & Lewis*, for defendants.

(The judgments in above cases were affirmed by the Supreme Court without report March 5, 1895.)